1
2
3          **UNITED STATES DISTRICT COURT**
4              **DISTRICT OF NEVADA**
5
6  JOHN WITHEROW, ET AL.,          )
                                   )        3:01-CV-0404-LRH (VPC)
7          Plaintiffs,             )
                                   )
8      vs.                         )        **REPORT AND RECOMMENDATION**
                                   )        **OF U.S. MAGISTRATE JUDGE**
9  JACKIE CRAWFORD, ET AL.,        )
                                   )
10         Defendants.             )        November 7, 2006
                                   )
11
12       This Report and Recommendation is made to the Honorable Larry R. Hicks, United States
13  District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C.
14
15  § 636(b)(1)(B) and LR IB 1-4.  Before the court is defendants' motion for summary judgment
16  (#167).  Plaintiffs opposed (#175), and defendants replied (#187).
17       The court has thoroughly reviewed the record and the motions and recommends that
18  defendants' motion for summary judgment (#167) be granted in part and denied in part.
19              **I.  HISTORY & PROCEDURAL BACKGROUND**
20       **A. Procedural Background**
21
22       Plaintiff John Witherow ("Witherow") is currently incarcerated at Lovelock Correctional
23  Center ("LCC") in the custody of the Nevada Department of Corrections ("NDOC") (#151).
24  Witherow's claims involve events that occurred while he was incarcerated at Northern Nevada
25  Correctional Center ("NNCC") (#89).  Plaintiff Julie Sikorski ("Sikorski") is plaintiff's mother.[1]
26  *Id*.  Plaintiffs brought this action pursuant to 42 U.S.C. § 1983, alleging prison officials violated
27
28
_____

[1] Pursuant to this court's Report and Recommendation (#177), on August 24, 2006, plaintiff Barbara Keenan was dismissed for failure to prosecute (#192).

their civil rights during Witherow's incarceration at NNCC because defendants improperly censored plaintiffs' mail and failed to follow its own administrative process requiring that NNCC provide a prisoner and the sender notice and an opportunity to appeal censorship decisions (#89). Plaintiffs originally named as defendants Jackie Crawford and NNCC correctional officers Charles Fournier, Michael Hoff, and Steven Suwe, although current defendants are Fournier and Hoff.[2] *Id*.

This action was originally filed in April, 2002 (#12), followed by the filing of an amended complaint (#14), a second amended complaint (#64), and a third amended complaint (#89). In May 2003, Donald Evans was substituted in as counsel for Witherow (#60) and he now also represents Sikorski. Several claims for relief have survived dispositive motions, and plaintiffs generally allege that defendants improperly censored Witherow's mail in violation of the First, Fourth and Fourteenth Amendments (#89).[3]

Because plaintiffs allege 184 separate counts, they are summarized below:

1) Count 1: Plaintiff Witherow asserts that defendant Fournier censored Witherow's mail from his attorney on February 10, 2000, without notice or right to appeal and without legitimate or reasonable penological purpose or goal;

2) Counts 2 and 4: Plaintiff Witherow contends that defendants Fournier and Hoff censored Witherow's mail to and from former plaintiff Keenan on February 10 and 29, 2000, without probable cause that the letters contained evidence of a crime that was documented in writing and

---

[2] On March 28, 2005, the District Court granted defendants' motion to dismiss in part and dismissed defendants Jackie Crawford and Steven Suwe (#98). On September 26, 2005, the Court denied defendants Fournier and Hoff's motion to dismiss pursuant to Rule 12(b)(7) and Rule 19 of the Federal Rules of Civil Procedure (#118).

[3] In a Report & Recommendation ("R&R") dated October 12, 2004, this Court recommended dismissal of Witherow's claims regarding his First Amendment right of access to the courts and his Sixth Amendment right to counsel (#94). The District Court adopted and accepted this Court's R&R on March 28, 2005 (#98).

submitted to the Warden, without notice or right to appeal and without legitimate or reasonable penological purpose or goal;

3) <u>Count 3</u>: Plaintiff Witherow contends that defendants Fournier and Hoff censored Witherow's mail to and from former plaintiff Keenan on February 11, 2000 without legitimate or reasonable penological purpose or goal;

4) <u>Counts 5 – 24</u>: Plaintiffs Witherow and Sikorski claim that Fournier and Hoff censored Witherow's mail to and from Sikorski without probable cause that the letters contained evidence of a crime that was documented in writing and submitted to the Warden, without notice or right to appeal and without legitimate or reasonable penological purpose or goal;

5) <u>Counts 25 – 134</u>: Plaintiff Witherow claims that Fournier and Hoff censored Witherow's mail to and from former plaintiff Keenan (counts 25 – 56) and non-parties (counts 57 – 134) without probable cause that the letters contained evidence of a crime that was documented in writing and submitted to the Warden, without notice or right to appeal and without legitimate or reasonable penological purpose or goal; and

5) <u>Counts 135 – 184</u>: Plaintiff Witherow claims that Fournier and Hoff censored Witherow's mail to and from his attorneys without probable cause that the letters contained evidence of a crime that was documented in writing and submitted to the Warden, without notice or right to appeal and without legitimate or reasonable penological purpose or goal (#89).

Plaintiffs contend that Administrative Regulation ("AR") 750 directs that prison officials must have reasonable or probable cause to censor inmate mail and that inmates must receive notice and a right to appeal when prison officials censor their mail.  *Id*.  AR 750 is the principal prison regulation governing inmate mail and correspondence, *see* #167, Ex. A, AR 750 (Aug. 8, 1984),

3

however, there are other prison regulations and procedures that work in concert with AR 750.[4]  AR 750 defines "censorship" as reading, deleting or removing portions of mail, or returning mail to the sender, and "inspection" as opening, but not reading, mail to look for contraband.  *See* AR 750(IV)(C) – (D).  "Contraband" is defined as "any item... not authorized by departmental regulations... or which is received by an unauthorized source... or that poses a serious threat to the security of an institution." *See* #167, Ex. B, AR 711(IV)(D)(1)-(2).  The Court will address AR 750 with regard to the above claims in three categories: a) privileged correspondence (Counts 1 and 135 – 184); b) general correspondence (Counts 5 – 24 and 57 – 134); and c) inmate-to-inmate correspondence (Counts 2 – 4 and 25 – 56).

### a. Privileged Correspondence (Counts 1 and 135 – 184)

AR 750 defines "privileged correspondence" as, among other things, any mail between the inmate and an attorney.  *See* #167, Ex. A, AR 750( IV)(A); *see also*, #167, Ex. D, Institutional Procedure 7.15 for NNCC, "Privileged Correspondence."  "Reading, opening or inspecting" privileged outgoing mail is "prohibited unless prison officials have probable cause documented in writing and submitted to the Warden of the institution that the letter contains evidence of a crime." AR 750(V)(F)(4), "Outgoing Mail," p. 4.[5]  All incoming privileged mail "may be opened and examined (not read) for... contraband, but <u>only</u> in the presence of the inmate to whom the communication is addressed." AR 750(V)(D)(2)(b), "Incoming Mail," p. 4 (emphasis in original);

---

[4] *See* #167, Ex. B, AR 711, "Inmate Personal Property"; #167, Ex. D, Institutional Procedure ("IP") 7.15 for NNCC, "Privileged Correspondence"; #167, Ex. H, IP 7.02 for NNCC, "Inmate Mail and Correspondence"; #167, Ex. J, Administrative Directive ("AD") 15-95 (Jan. 19, 1995); #167, Ex. K, AD 57-95 (Jan. 19, 1995);

[5] The Court notes that the defendants' submitted copy of A.R. 750, *see* #167, Ex. A, is misnumbered within the document.  Section V of AR 750 contains subsections A – F, followed by subsections D – K. Thus, there are two subsections D, E, and F.  To avoid confusion, when citing to subsections D – F, the Court will also cite to the name of each subsection and the page number.

*see also* #167, Ex. H, IP 7.02(VI)(F)(1).  Any contraband found in incoming mail may be seized and returned to the sender, however, "in all cases where mail is to be returned," the prison must provide the inmate and the sender with notice, the basis for the seizure, and an opportunity to appeal the decision.  AR 750 (V)(D)(1), "Incoming Mail," p. 4.

Specifically with regard to Count I, which involves a book sent to Witherow by his attorney, AR 750 requires that all incoming packages have "prior approval."  AR 750(V)(I)(2)(a), "Packages," p.6.  Incoming packages from privileged correspondents are opened and inspected in the same manner as letters from privileged correspondents.  AR 750 (V)(I)(1), "Packages," p. 6. Only listed items may be received in packages and any item not on the approved list will be returned to the sender.  AR 750 (V)(I)(2)(b), (d), "Packages," p. 6-7**.**  Legal packages are considered "documents only."  *See* #167, Ex. K, Administrative Directive ("AD") 57-95(B) (Jan. 19, 1995). Any publication that presents a "clear and present danger to the security of the institution" may be rejected.  AR 750 (V)(J)(1).

**b. General Correspondence (Counts 5 – 24 and 57 – 134)**

AR 750 defines "general correspondence" as any mail that is not "privileged correspondence."  AR 750( IV)(B).  The rules for processing general outgoing mail are the same as for privileged outgoing mail.  AR 750(V)(F)(4), "Outgoing Mail," p. 4.  All general incoming mail may be opened and inspected for contraband outside the presence of the inmate, and in all cases where incoming mail is returned, the inmate and the sender are to be notified with the reason for the return and given the opportunity to appeal the decision.  AR 750 (V)(D)(1) and (3)(b), "Incoming Mail," p.4.  General incoming correspondence may be censored (read) if, among other things, it is found that the correspondence contains threats of criminal activity, addresses introducing contraband into the institution or sending contraband out of the institution, or concerns

5

plans for activities in violation of institutional rules or for criminal activity.  AR 750 (V)(E)(1) –

(9), "Disapproval of Incoming General Correspondence," p. 5; *see also* #167, Ex. H, IP

7.02(VI)(F)(3).  If an inmate's general incoming correspondence is censored, "a written notice,

signed by the official authorizing the censorship and stating the reason(s) for censorship shall be

given to the sender and the inmate advising also of the right to appeal the censorship decision." AR

750 (V)(D)(3)(C), "Incoming Mail," p. 4-5; *see also* #167, Ex. H, IP 7.02(VI)(F)(2).  An inmate has

the right to appeal all instances of censorship, whether involving incoming or outgoing mail,

"within five (5) days of the occurrence."  AR 750 (V)(F), "Appeal Rights," p. 6; *see also* #167, Ex.

H, IP 7.02(VI)(F)(6).  When is it "deemed necessary" to censor an inmate's general incoming

correspondence, a written record shall be made that includes the inmate's name, the reason for the

censorship and the signature of the staff person reading the mail.  AR 750 (V)(D)(3)(d), "Incoming

Mail," p. 5.

### c. Inmate-to-Inmate Correspondence (Counts 2 – 4 and 25 – 56)

Inmates may not correspond with other incarcerated persons unless they have received

approval in writing.   AR 750(V)(F)(2)(b), "Outgoing Mail," p. 3; *see also* #167, Ex. H, IP

7.02(VI)(D).

### B. Factual Background

Based on the plaintiff' third amended complaint (#89), defendants' answer (#155), the

pending motion for summary judgment (#167), opposition (#175) and reply (#187), the following

facts are undisputed and supported by evidence:[6]

1. On December 21, 1999, defendant Fournier, a correctional officer and facility investigator

at NNCC, requested permission of the Warden to "monitor" plaintiff's mail pursuant to a criminal

---

[6] After giving plaintiffs the full benefit of the doubt, the Court concludes that plaintiffs have failed to allege any facts in the Third Amended Complaint to support their claims (#89).

investigation based on information he had received from other prisoners implicating the plaintiffs in a drug scheme (#167, Ex. M; #175, p.9).

2.  On December 23, 1999, defendant Fournier requested permission from the Warden to "censor" Witherow's mail for an indefinite period of time pursuant to the same investigation (#175, p.9; #187, p.3).  A December 23, 1999 notice to Witherow regarding censorship contained a notation that stated "this notice will be held pending investigation," which the Warden signed (#175, p.9; #187, Ex. B, pp.19-20).

3. On February 9, 2000, Witherow mailed a letter to former plaintiff Barbara Keenan, which defendants read ( #167, p. 3; #175, Ex. 2, p.43).

4. On February 10, 2000, Witherow received a large envelope marked "legal mail" from his attorney, which contained a book called "Ur-Ine Trouble" (#167, p.3; #175, p.10).  This envelope was opened in Witherow's presence, the book was confiscated, and Witherow appealed the decision to confiscate the book (#167, p.3; #175, Ex. 2, p.36).

5. On February 11, 2000, mail from former plaintiff Keenan, who was on parole, was not delivered to Witherow because the prison considers parolees "inmates" for the purposes of prohibiting inmate-to-inmate correspondence (#167, p.3; #175, p.11)).  Plaintiff Witherow was notified in writing of the February 11, 2000 incident (#167, p.3; #175, Ex.2, p.46).

6. During the course of the investigation, defendant Fournier opened some of Witherow's mail, reviewed and photo-copied it, and then caused the mail to be delivered (#175, p.9 and Ex. 3, p.49).

7. Plaintiff Witherow's mail was monitored and censored for the remainder of his stay at NNCC pursuant to defendant Fournier's investigation (#167, p.3).

///

7

## II.  DISCUSSION & ANALYSIS

### A. Discussion

#### 1. Motion for Summary Judgment Standard

In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  In inmate cases, the courts must

> distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, __ U.S. __, 126 S.Ct. 2572, 2576 (2006).  The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(C).  Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 , 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 248.

#### 2. Prisoners' General Constitutional Rights

"'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Sandin v. Conner*, 515 U.S. 472, 485 (1995), *citing Jones v. North Carolina Prisoners' Union*, 433

U.S. 119, 125 (1977) and *quoting Price v. Johnston*, 334 U.S. 266, 285 (1948); *see also Shaw v. Murphy*, 532 U.S. 223, 229 (2001) ("the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large").

However, "prison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987), "nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside'." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). Nevertheless, these rights must be weighed with "due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Id*. at 407 *quoting Turner*, 482 U.S. at 85. Prison officials must weigh the need for internal order and security against the rights of prisoners and those on the outside who seek to communicate with such prisoners. *Id*.

### 3. First Amendment Rights – Inmate Correspondence

Generally, prisoners have "a First Amendment right to send and receive mail." *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (per curiam). However, a "delicate balance" must be stricken between prisoners' First Amendment rights and the discretion given to prison administrators to govern the order and security of the prison. *Thornburgh*, 490 U.S. at 407-08.

#### a. Outgoing Mail

Prison regulations concerning out-going mail must further "important or substantial governmental interest[s] unrelated to the suppression of expression" and must be generally necessary to protect legitimate government interests. *Procunier v. Martinez*, 416 U.S. 396, 413-14 (1974), *limited by Thornburgh v. Abbott*, 490 U.S. 401, 406 (1989) ("[w]e acknowledge today that the logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence."). Regulations concerning out-going mail must more closely fit the interest served than regulations concerning incoming mail. *Thornburgh*, 490 U.S. at 413;

*Witherow*, 52 F.3d at 265.  Prison officials may justifiably censor out-going mail concerning escape plans, information about proposed criminal activity, or the transmittal of encoded messages. *Martinez*, 416 U.S. at 413; *see also Wolff v. McDonnell*, 418 U.S. 539, 576 (1974).  Prison officials may also visually inspect out-going mail to determine whether it contains contraband material which threatens prison security or material threatening the safety of the recipient.  *Witherow*, 52 F.3d at 266.

### b. Incoming Mail

While the substantive requirements in *Martinez* govern outgoing mail, *Turner* is applicable to regulations regarding all incoming mail.  *Thornburgh*, 490 U.S. at 413.  Prison officials have more leeway to regulate incoming mail because of the greater security risks inherent in materials coming into a prison.  *Id*.  Regulations involving incoming mail are "valid if [they] are reasonably related to legitimate penological interests."  *Turner*, 482 U.S. at 89.

*Turner* sets out a four-part test which governs prison policies and regulations concerning incoming mail: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the rights that remain open to prison inmates"; (3) what "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and, (4) whether the "absence of ready alternatives is evidence of the reasonableness of a prison regulation."  *Turner*, 482 U.S. at 89-90.  As to the first element of the test, the *Turner* Court found that in the First Amendment context  it is important to inquire whether the restriction operates in a "neutral fashion, without regard to the content of the expression."  *Id*. at 90.

The *Turner* test applies to the constitutional rights of both the inmates and the outsiders who

communicate with them.  *See Thornburgh*, 490 U.S. at 411, n.9 ("[a]ny attempt to forge separate

standards for cases implicating the rights of outsiders is out of step [with cases in between *Martinez*

and *Turner*], which all involved regulations that affected the rights of prisoners and outsiders.").

Finally, the court stated in *Turner* that prison officials may entirely prohibit correspondence

between inmates based on security concerns.  *Turner*, 482 U.S. at 92-3.

### c. Legal Mail

The Supreme Court has upheld a procedure whereby prisons can open mail from privileged

correspondents only in the presence of inmates to check for contraband.  *Wolff v. McDonnell*, 418

U.S. 539, 576-77 (1974).  The Court stated, "[a]s to the ability to open the mail in the presence of

inmates, this could in no way constitute censorship, since the mail would not be read.  Neither could

it chill such communications, since the inmate's presence insures that prison officials will not read

the mail."  *Id*. at 577.  In an unpublished case, the Ninth Circuit found that the implication of

*Wolff's* holding is that prison officials may open and scan mail from attorneys to inmates for

contraband as long as they do not read it.  *Brigaerts v. Marshall*, 54 F.3d 785, *3 (9th Cir. 1995)

(unpublished)[7].  Yet, the Ninth Circuit has also found that the Supreme Court has never specifically

held that inmates have a constitutional right to be presentation when prison officials read incoming

attorney mail.  *Royse v. Superior Court of the State of Washington in and for Walla Walla County*,

779 F.2d 573, 575 (9th Cir. 1986) ("Although the Court in *Wolff* suggested that an inmate's

presence during inspection is adequate protection against prison officials reading his mail... it did

---

[7] Pursuant to the Rules for the United States Court of Appeals for the Ninth Circuit, unpublished decisions of the Ninth Circuit may not be cited to except in the following circumstances: (i) when relevant under the doctrine of law of the case, res judicata, or collateral estoppel; (ii) for factual purposes, such as to show double jeopardy, sanctionable conduct, notice, entitlement to attorneys' fees, or the existence of a related case; or (iii) in a request to publish a disposition or order made pursuant to Circuit Rule 36-4, or in a petition for panel rehearing or rehearing en banc, in order to demonstrate the existence of a conflict among opinions, dispositions, or orders.  9th Cir. R. 36-3(b).

not consider whether reading an inmate's mail despite his presence would violate his constitutional

rights); *see also Sherman v. MacDougall*, 656 F.2d 527, 528 (9th Cir. 1981); *accord Lamon v.*

*Director of the California Department of Corrections*, 2006 WL 1820084, *4 (E.D.Cal. 2006).[8]

### 4. Fourth Amendment Right to Privacy

Prisoners have "extremely limited" Fourth Amendment rights while incarcerated. *United*

*States v. Vallez*, 653 F.2d 403, 406 (9th Cir. 1981), *receded from on other grounds by United States*

*v. Goseyun*, 789 F.2d 1386 (9th Cir. 1986) and *citing Stroud v. United States*, 251 U.S. 15, 21-2

(1919); *see also Hudson v. Palmer*, 468 U.S. 517, 530 (1984) (holding that an inmate does not have

a reasonable expectation of privacy in his prison cell); *see generally Bell v. Wolfish*, 441 U.S. 520

(1979) (stating that while prisoners "retain some Fourth Amendment rights upon commitment to

a corrections facility," nonetheless, reasonable searches for the "significant and legitimate security

interests of the institution" are permissible).  In *Stroud*, the Court upheld the seizure of an inmate's

letters, finding that the letters "came into the possession of the officials of the penitentiary under

established practice, reasonably designed to promote the discipline of the institution." *Stroud*, 251

U.S. at 21-22.  The Court noted that "under such circumstances there was... [no] unreasonable

search and seizure, in violation of his constitutional rights." *Id.* at 22.  Further, in *Vallez*, the Ninth

Circuit held that although a prison inmate has a reasonable expectation of privacy in a sealed letter,

the warrantless seizure of a sealed letter from a prisoner's cell does not violate the Fourth

---

[8] In discussing legal mail, defendants quote to a passage from *Shaw v. Murphy*, 532 U.S. 223 (2001) which states, "[T]he issue before us is whether *Turner* permits an increase in constitutional protection whenever a prisoner's communication includes legal advice.  We conclude that it does not" (#167, p.6).  To the extent that the defendants infer that *Shaw* holds that legal correspondence cannot be given more protection than general correspondence, the Court rejects this proposition.  *Shaw* did not concern attorney-client communications; rather, the issue was whether an inmate law clerk had a "First Amendment right to provide legal advice that enhances the protection otherwise available under *Turner*." *Shaw*, 532 U.S. at 228.  The Court concluded there is no such special right and held that the test enunciated in *Turner* applies.  *Id.* at 232.  Thus, *Shaw* sheds no light on the law governing confidential communications from an attorney to an inmate.

1   Amendment if "it serves a 'justifiable purpose of imprisonment or prison security.'" *Vallez*, 653

2   F.2d at 406, *citing United States v. Savage*, 482 F.2d 1371, 1373 (9th Cir. 1973).

3                    **5. Fourteenth Amendment Right to Due Process**

4           The procedural guarantees of the Fourteenth Amendment's Due Process Clause apply only

5   when a constitutionally-protected liberty interest is at stake.  *Tellis v. Godinez*, 5 F.3d 1314, 1316

6   (9th Cir. 1995), *citing Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972).  Liberty

7

8   interests can arise both under the Constitution and from state law.  *Wolff*, 418 U.S. at 557-58.

9           With respect to liberty interests created under the Constitution, the Court has held that

10  prisoners have a Fourteenth Amendment liberty interest in "uncensored communication by letter,"

11  although this interest is "qualified of necessity by the circumstance of imprisonment."  *Martinez*,

12  416 U.S. at 417-18; *see also Frost v. Symington*, 197 F.3d 348, 353 (9th Cir. 1999) (prisoners have

13

14  a "Fourteenth Amendment due process liberty interest in receiving notice that... incoming mail is

15  being withheld by prison authorities"), *citing Thornburgh*, 490 U.S. at 406.  This liberty interest is

16  protected from "arbitrary government invasion," and any decision to censor or withhold delivery

17  of mail must be accompanied by "minimum procedural safeguards."  *Martinez*, 416 U.S. at 418.

18  The Court in *Martinez* noted that the following minimum procedures were required: (1) notifying

19  the inmate of the rejection of a letter; (2) allowing the author of the letter a reasonable opportunity

20

21  to protest the decision; and (3) referring any complaints to a prison official other than the person

22  who made the censorship decision.  *Id*. at 418-19.  The Ninth Circuit "has repeatedly acknowledged

23  that withholding delivery of inmate mail must be accompanied by the minimum procedural

24  safeguards" established in *Martinez*.  *Krug v. Lutz*, 329 F.3d 692, 697-98 (9th Cir. 2003), *citing*

25

26  *Sorrels v. McKee*, 290 F.3d 965, 972 (9th Cir. 2002) and *Prison Legal News v. Cook*, 238 F.3d 1145

27  (9th Cir. 2001).

28

                                        13

Regarding state-created liberty interests, the Supreme Court has held that states may under some circumstances create liberty interests protected by the Due Process clause, but that those liberty interests "will be generally limited to freedom from restraint which... impose[s] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 484.

**B. Analysis**

**1. Does AR 750 create a liberty interest?**

The threshold question is whether the plaintiffs have a state-created liberty interest in AR 750 and the answer will determine what plaintiffs are owed under either AR 750 and/or the Constitution. Defendants contend that plaintiffs have no "liberty interest" in AR 750 such that they were owed no due process at all, that Witherow's rights pertaining to communications with those outside the prison walls is severely curtailed by the fact of his incarceration, and that "all" of the plaintiff's incoming and outgoing mail may be read because he is in prison (#167). Defendants contend that *Sandin v. Conner*, 515 U.S. 472 (1995) applies to preclude the court from finding that plaintiffs have a state-created liberty interest in AR 750. *Id*.

Plaintiffs counter that the defendants censored his incoming and outgoing mail without probable or reasonable cause, without legitimate penological reasons, and without notice or an opportunity to appeal in violation of AR 750 and his constitutional rights (#175). Plaintiffs do not challenge the constitutionality of any NDOC regulations; rather, they challenge the fact that prison officials did not follow the procedures set out in AR 750, which plaintiffs contend codify their constitutional rights. *Id*. Plaintiffs argue that they each have a First and Fourth Amendment right to privacy in their communications, a right to privacy in their personal and familial relationships, and a common law privacy right to uncensored, confidential communications with an attorney, all of which are liberty interests protected by the Fourteenth Amendment right to due process. *Id*.

14

From these rights, it follows they have a right to "uncensored communications with each other or other persons by letters contained in sealed envelopes via the mail," which may be opened by the government only pursuant to a judicially approved search warrant, although plaintiffs later concede that prison officials may adopt regulations that infringe on these constitutional rights to advance legitimate penological interests.  Plaintiffs argue that *Sandin* does not apply and that pursuant to *Mendoza v. Blodgett*, 960 F.2d 1425 (9th Cir. 1992), they have a liberty interest in AR 750 based on the fact that the regulation contains mandatory provisions derived from the First, Fourth and Fourteenth Amendments.  *Id*.  In other words, plaintiffs argue that in promulgating AR 750, defendants are obligated to comply with its mandatory provisions.  *Id*.

In *Sandin*, the Court considered whether certain prison disciplinary regulations regarding proceedings for inmate misconduct created a liberty interest such that the prison was required under the due process clause to provide the inmates with the procedures set out in the regulations. *Sandin*, 515 U.S. at 484.  The lower court in *Sandin* followed case law in *Hewitt v. Helms*, 459 U.S. 460 (1983), which focused on whether the state had gone beyond issuing mere procedural guidelines and had used "language of an unmistakably mandatory character." *Conner v. Sakai,* 15 F.3d 1463, 1466 (9th Cir. 1993).  The lower court held that the mandatory directives in the regulation created a protected liberty interest.  *Id*.  The Supreme Court reversed, noting that the *Hewitt* methodology "encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." *Sandin,* 515 U.S. at 481. This result was undesirable because prison regulations are "not designed to confer rights on inmates," but are "primarily designed to guide correctional officials in the administration of a prison." *Id*.  Thus, without overruling former case law, the Supreme Court "abandoned" the *Hewitt* language.  *Id*. at 484, n.5 ("such abandonment of *Hewitt's* methodology does not technically

require us to overrule any holding of this court."). The Court held that states may under some circumstances create liberty interests protected by the Due Process clause, but that those liberty interests "will be generally limited to freedom from restraint which... impose[s] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 484.

Although *Sandin* involved prison discipline, the defendants nevertheless contend that *Sandin* applies to non-disciplinary regulations and policies. Plaintiffs disagree and rely on *Mendoza v. Blodgett*, 960 F.2d 1425 (9th Cir. 1992) for their position that AR 750 creates a protected liberty interest. *Mendoza* involved a Fourteenth Amendment procedural due process challenge to a prison regulation. *Mendoza*, 960 F.2d at 1427. Citing *Hewitt* and its progeny, the Ninth Circuit in *Mendoza* found that the prison regulation at issue had created a liberty interest based on the mandatory language found in the regulation. *Id*. at 1428-29, *citing Hewitt* and *Kentucky Dept. Of Corrections v. Thompson*, 490 U.S. 454 (1989). The Westlaw citation for *Mendoza* does not indicate that it has been overruled even though *Mendoza* relied primarily on *Hewitt* in its analysis, and *Sandin* specifically "abandoned" *Hewitt's* methodology.

Unfortunately, the parties failed to brief this issue; instead, they make general conclusory statements that their line of case authority applies to this situation. The Ninth Circuit has routinely applied *Sandin* in cases concerning prison disciplinary hearings, however, the Court has found no case in which the Ninth Circuit applied *Sandin* to regulations concerning the procedural due process required in relation to inmate mail. In 2002, the Ninth Circuit stated "[i]t is clear from the Court's framing of the problem in *Sandin*, that *Sandin's* holding was limited to internal prison disciplinary regulations." *McQuillion v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002). However, because *McQuillion* involved a parole revocation hearing and there was clear Supreme Court law that governed, *McQuillion* did not distinguish the *type* of right involved, and instead distinguished

a parole from a prison situation.  *Id.*  Further, in *Mitchell v. Dupnik*, 75 F.3d 517 (9th Cir. 1996),

an inmate brought a Fourteenth Amendment due process claim based on the fact that the prison

had failed to follow its internal procedures when it conducted a routine search of his cell by failing

to allow the inmate to be present when his "legal papers" were searched as required under internal

prison regulations.  *Mitchell*, 75 F.3d at 522.  The Ninth Circuit applied *Sandin* to this claim,

finding that the search of his cell was "not a dramatic departure from the basic conditions of

incarceration," and that the inmate did not have a liberty interest in the prison regulation.  *Id.* at

522-23.

Finally, in discussing the types of cases which had focused too much on the mandatory

language analysis rather than the nature of the right involved, *Sandin* itself references a number

of cases that do not involve prison disciplinary situations.  *Sandin*, 515 U.S. at 483, *citing Segal

v. Biller*, No. 94-35448, 1994 WL 594705 (9th Cir. Oct. 31, 1994) (unpublished) (case claiming

liberty interest in a waiver of the travel limit imposed on prison furlough), *Burgin v. Nix*, 899 F.2d

733, 735 (8th Cir. 1990) (claiming liberty interest in receiving a tray lunch rather than a sack

lunch), and *Lyon v. Farrier*, 727 F.2d 766, 768-769 (8th Cir. 1984) (claiming liberty interest in

freedom from transfer to a smaller cell without electrical outlets for televisions and liberty interest

in prison job).

Based on this analysis, the Court concludes that *Sandin* applies to this case.  AR 750

involves the censorship, inspection and general handling of inmate mail.  It does not contain any

threat of restraint that might "exceed the sentence in such an unexpected manner as to give rise to

protection by the Due Process Clause of its own force."  *Sandin*, 515 U.S. at 484.  Censorship and

inspection of mail are certainly "ordinary incidents of prison life."  *See Procunier v. Martinez*, 416

U.S. 396, 413-14 (1974) (permitting censorship of inmate mail if it is accompanied by minimum

procedural safeguards); *see also Wolff v. McDonnell*, 418 U.S. 539, 557-58 (1974) (allowing prison officials to open and inspect for contraband all mail sent by attorneys or privileged correspondents in the presence of the inmate without infringing on the constitutional rights of the inmate and stating "this is all, and perhaps even more, that the Constitution requires."); *see also Turner v. Safley*, 482 U.S. 78, 92-3 (1987) (prison officials may entirely prohibit correspondence between inmates based on security concerns).  As such, the existence of AR 750 does not, by itself, create a liberty interest; therefore, plaintiffs are not owed any of the procedures in AR 750.

### 2. First Amendment Claim

Since the Court concludes that plaintiffs have no liberty interest in AR 750, they are not owed any of its protections and are entitled only to what the Constitution requires.  While the plaintiffs' First Amendment claim is unclear,[9] the Court construes it to be based on the contention that the defendants censored the plaintiffs' mail "without legitimate or reasonable penological purpose or goal" (#89).  The issue, then, is whether the defendants' decision to censor the plaintiffs' mail was proper under First Amendment jurisprudence.  Defendants repeatedly cite to *O'Keefe v. Van Boening*, 82 F.3d 322, 326 (9th Cir. 1996) for the proposition that all incoming and outgoing prisoner mail may be opened and read (#167).  However, *O'Keefe* does not stand for that proposition.[10]  The Court considers plaintiffs' First Amendment claim in three categories: a)

---

[9] The Court notes that Witherow, as a jailhouse lawyer or paralegal, may have a substantial role in the legal research and drafting of papers filed with the Court under the signature of plaintiffs' counsel. Plaintiffs' counsel is cautioned that he is bound by the requirements of Fed.R.Civ.P. 11.

[10] In *O'Keefe*, the issue was whether the prison regulations' failure to treat certain types of mail as "legal mail" was valid.  *O'Keefe*, 82 F.3d at 323, n.1.  The court noted that the regulations in *O'Keefe* allowed the prison mailroom to "open and read incoming and outgoing regular mail, before distributing and sending it, to prevent criminal activity and to maintain prison security."  *Id*. at 323.  The Ninth Circuit specifically stated that it "express[ed] no opinion concerning the validity" of those regulations as it was only addressing the definition of "legal mail."  *Id*.  Thus, the Court in *O'Keefe* did not conclude that prison officials may open and read all incoming and outgoing mail.

general correspondence; b) privileged correspondence; and c) inmate-to-inmate correspondence.

**a. General Correspondence (Counts 5 – 24 and 57 – 134)**

In *Shaw v. Murphy*, 532 U.S. 223 (2001), the Court stated that "in the First Amendment context... some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'" *Id*. at 229. Generally, prisoners have "a First Amendment right to send and receive mail," *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (per curiam); however, this right must be balanced with the discretion afforded to prison administrators to govern the order and security of the prison. *Thornburgh*, 490 U.S. at 407-08. Prison officials may justifiably censor out-going mail concerning escape plans, information about proposed criminal activity, or transmittal of encoded messages. *Martinez*, 416 U.S. at 413. Prison officials have more leeway regarding incoming mail due to greater security risks inherent in materials coming into a prison*, Thornburgh*, 490 U.S. at 413; thus, policies involving incoming mail are "valid if [they] are reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. These rules apply to both inmates and non-inmates alike. *See Thornburgh*, 490 U.S. at 411, n.9.

With respect to incoming mail, the initial question is whether there is a "valid, rational connection" between the prison's decision to censor the plaintiffs' mail and the "legitimate governmental interest put forward to justify it," namely, the criminal investigation. *Turner v. Safely*, 482 U.S. 78, 89-90 (1987). The prison obviously has a legitimate penological interest in maintaining a safe institution free from illegal activity such as drugs. Defendant Fournier received information that other inmates were instructed to send payment for illegal drugs through the mail to Witherow's mother, Sikorski (#167, Ex. N).[11] The defendants' investigation was directly aimed

---

[11] Although Witherow disputes whether this information was true, because the plaintiffs have no liberty interest in AR 750 and are not owed the probable cause requirements, the issue is not whether the

at protecting prison security, a purpose the Court has said is "central to all other correction goals."

*Thornburg*, 490 U.S. at 415.  It is certainly reasonable to censor the mail of an inmate when that

inmate has allegedly been using the mails to conduct criminal activity.  As the Court has stated,

> [P]rison officials may well conclude that certain proposed
> interactions, though seemingly innocuous to laymen, have
> potentially significant implications for the order and security of the
> prison.  Acknowledging the expertise of these officials and that the
> judiciary is "ill equipped" to deal with the difficult and delicate
> problems of prison management, the Court has afforded considerable
> deference to the determinations of prison administrators who, in the
> interest of security, regulate the relations between prisoners and the
> outside world.

*Thornburgh*, 490 U.S. at 407-08.  Thus, the Court finds the first element of *Turner* is satisfied and

concludes that there was a "valid rational connection" between the censorship and the

investigation.  *See Turner*, 482 U.S. at 89.

The next inquiry under *Turner* is whether there are "alternative means of exercising the

rights that remain open to prison inmates."  *Id*. at 90.  Since the plaintiffs in this action were free

to communicate via telephone, the censorship of plaintiffs' mail did not foreclose all avenues of

communication.  The third *Turner* factor is what "impact [that] accommodation of the asserted

constitutional right will have on guards and other inmates, and on the allocation of prison resources

generally."  *Id*.  The influx of illegal drugs into the prison system is an obvious and serious security

concern for guards, prison administrators, inmates and the public.  The fourth *Turner* factor is

whether the "absence of ready alternatives is evidence of the reasonableness of a prison

regulation."  *Id*.  The Court notes that plaintiffs have identified no method other than censoring the

plaintiffs' mail to determine whether the plaintiffs were using the mails to conduct criminal

---

information was true and constituted probable cause, but whether, in the discretion of prison officials, this
information was enough to conduct a criminal investigation through censoring the plaintiffs' mail. The Court
concludes that it was sufficient.

activity.

Finally, with regard to outgoing mail, *Martinez* allows prison officials to justifiably censor outgoing mail which contains information about proposed criminal activity. *Martinez*, 416 U.S. at 413. The defendants had cause to believe that the plaintiffs were bringing illegal drugs into the prison and, therefore, could justifiably censor their mail. This Court finds that under the foregoing analysis, plaintiffs' First Amendment claim as to Counts 5 – 24 (mail between Witherow and Sikorski) and Counts 57 – 134 (mail between Witherow and nonparties) fails because the defendants had a legitimate penological reason to censor the plaintiffs' incoming and outgoing mail pursuant to the criminal investigation.

#### b. Privileged Correspondence (Counts 1 and 135 – 184)

The Court notes from the outset that Witherow's First Amendment right to access to the courts claims were dismissed pursuant to this Court's Report & Recommendation dated October 12, 2004 (#94, #98). To the extent that Witherow is arguing that he has a First Amendment right to uncensored privileged communications with his attorney, *see* #175, p. 12-14, the Court addresses that argument here. In *Wolff*, the Court upheld a procedure whereby prisons could open mail from privileged correspondents only in the presence of inmates to check for contraband, stating that the presence of the inmate "insures that prison officials will not read the mail." *Wolff v. McDonnell*, 418 U.S. 539, 576-77 (1974). The Ninth Circuit has found that the implication of *Wolff's* holding is that prison officials may open and scan mail from attorneys to inmates for contraband as long as they do not read it, *see Brigaerts v. Marshall*, 54 F.3d 785, *3 (9th Cir. 1995) (unpublished), but has also held that the Supreme Court has never specifically found that inmates have a constitutional right to be present when prison officials read attorney mail. *Royse v. Superior Court of the State of Washington in and for Walla Walla County*, 779 F.2d 573, 575

1    (9th Cir. 1986).

2        With regard to the book called "Ur-Ine Trouble" sent by Attorney Evans to Witherow on

3    February 10, 2000, the Court finds that there are no genuine issues of material fact.  Defendants

4    assert that the envelope containing the book was opened because the defendants believed it was

5    a "package," and under the prison's regulations, the prison may open all packages.  *See* #167, p.11;

6    *see also* #167, Ex. A, AR 750(V)(I)(2)(a), "Packages," p.6.  Defendants, citing Witherow's

7    deposition, assert that Witherow did not have prior approval to receive this package, and thus, the

8    book was contraband because it was "unauthorized" (#167, p. 11).  Witherow disputes that this

9    envelope was a "package," disputes that the book was "contraband," and asserts that the envelope

10   was clearly marked as legal mail (#175, p. 7).

11       The arguments relating to how the mail was characterized are irrelevant.  The prison is

12   permitted to open all incoming mail, both general and privileged, to check for contraband, although

13   privileged mail must be opened in the presence of the inmate.  *See* #167, Ex. A, AR 750(V)(D)(1),

14   (2)(b), "Incoming Mail," p. 4.  The February 10, 2000 mail, labeled "legal mail," was opened in

15   Witherow's presence, the book was seized as contraband, and Witherow appealed the censorship

16   decision.  *See* #175, Ex. 2, p. 36.  Although Witherow disputes that the book was contraband, the

17   Court notes that anything that is "unauthorized" is contraband, *see* #167, Ex. B, AR 711(IV)(D)(1)-

18   (2), and that "books received through the mail must have prior approval of appropriate staff."  *See*

19   #167, Ex. B, AR 711(V)(J)(8), p. 12.  Witherow admits that he did not request or receive prior

20   approval for the book.  *See* #167, Ex. Q, p.32.  However, even if Witherow had prior approval, the

21   prison, in its discretion, reasonably believed a book concerning urine testing would be used by

22   Witherow and other inmates to circumvent prison disciplinary rules, and, thus, considered the book

23   to be contraband.  By challenging the prison's decision finding that the book was contraband,

1   Witherow requests this Court to substitute its judgment and overrule a discretionary function of

2   the prison.  This is not the function of the Court.  *Jones v. North Carolina Prisoners' Labor Union,*

3   *Inc.*, 433 U.S. 119, 128 (1977) ("The necessary and correct result of our deference to the informed

4   discretion of prison administrators permits them, and not the courts, to make the difficult

5   judgments concerning institutional operations.").  The Court concludes that summary judgment

6   
7   should be granted as to Count 1.

8       Regarding Counts 135 – 184 (mail between Witherow and Attorney Evans), there are no

9   genuine issues of material fact.  Although Witherow asserts that the defendants read mail from his

10  attorney, *see* #89, defendant Fournier's deposition testimony indicates that he did not censor any

11  
12  of the mail sent by Attorney Evans.  *See* #175, Ex. 3, p. 89 (denying that he opened any incoming

13  mail from Attorney Evans).  Other than his general allegations, Witherow has presented no

14  evidence whatsoever that defendants read or even opened this legal mail.  Moreover, Witherow

15  does not even allege any facts in his Third Amended Complaint to support these counts (#89).  As

16  
17  Witherow is represented by counsel, the Court will not give him the same leeway it would

18  normally give a *pro se* prisoner.  The Court finds that the defendants' motion for summary

19  judgment should be granted as to Counts 135 – 184.

20       **c. Inmate-to-Inmate Correspondence (Counts 2 – 4 and 25 – 56)**

21       Counts 2 – 4 and 25 – 56 pertain to mail communications that Witherow had with former

22  plaintiff Keenan.   Defendants argue that the prison has a legitimate interest in curbing

23  
24  communications between felons and that, despite being released, Keenan was an "inmate" while

25  on parole because she was still in the prison computer system, her location was being tracked, and

26  upon a violation of parole, she would have returned to prison under her former number (#167).

27  In support of this contention, defendants cite to a 1998 NDOC Administrative Directive that they

28

contend shows that parolees are still treated as inmates. #167, Ex. I, AD 46-95 (Oct. 15, 1998). Plaintiff argues that NDOC does not have a regulation limiting or restricting plaintiff's First Amendment right of freedom of association with respect to sending or receiving mail from a parolee (#175).

It is not clear whether the defendants censored Witherow's mail to and from Keenan pursuant to the criminal investigation or because they identified Keenan as a parolee. It does not appear that Keenan was implicated in the drug scheme. *See* #167, Ex. N. There is testimony that the defendants identified Keenan as a parolee and for this reason, mail between Witherow and Keenan was censored. *See* #175, Ex. 3, p. 58; Ex. 4, pp. 59-60. Yet, this conflicts with statements by the defendants in their motion that the February 9, 2000 letter to Keenan was reviewed pursuant to the continuing investigation of Witherow's mails (#167, p.3). Regardless, the Court finds that both of the prison's justifications are sufficient. As the Court already concluded, the criminal investigation was for a valid penological reason and if mail from Keenan was opened pursuant to the investigation, it meets constitutional standards. Further, under *Turner*, prison officials may entirely prohibit correspondence between felons based on security concerns. *See Turner v. Safley*, 482 U.S. 78, 93 (1987) ("Undoubtedly, communication with other felons is a potential spur to criminal behavior: this sort of contact frequently is prohibited even after an inmate has been released on parole. *See* 28 CFR § 2.40(a)(10)(1986) (federal parole conditioned on nonassociation with known criminals, unless permission is granted by the parole officer)"). Since the Court has concluded the prison's justifications for censoring Witherow's mail and prohibiting communication with Keenan are legally sufficient, and there remains no issue of material fact, the Court grants summary judgment to the defendants for Counts 2 – 4 and 25 – 56 on Witherow's First Amendment claims.

24

### 3. Fourth Amendment Claim

As noted above, prisoners have very limited Fourth Amendment rights while incarcerated. *United States v. Vallez*, 653 F.2d 403, 406 (9th Cir. 1981).  Although prisoners have a reasonable expectation of privacy in a sealed letter, *see United States v. Savage*, 482 F.2d 1371, 1373 n.1 (9th Cir. 1973), the warrantless seizure of a sealed letter is valid if it serves a "justifiable purpose of imprisonment or prison security." *Vallez*, 653 F.2d at 406.  *Vallez* involved the seizure from a prisoner's cell.  In this case, Witherow's sealed letters were "seized" in the mailroom rather than his cell, prior to arriving in Witherow's possession, and then released into the general mail for delivery.  The Court finds that there was a legitimate penological reason to intercept the plaintiffs' outgoing and incoming mail, namely, to investigate whether the plaintiffs were bringing illegal drugs into NNCC.  This investigation was "reasonably designed to promote prison security" by reading the plaintiffs' mail to keep illegal drugs out of the prison and prevent potential criminal behavior. *Vallez*, 653 F.2d at 406.  Thus, there is no violation of the plaintiffs' privacy rights under the Fourth Amendment.[12]

### 4. Fourteenth Amendment Claim

#### a. Due Process owed to the plaintiffs under the Constitution

Having established that the procedures in AR 750 are not state-created liberty interests, the Court turns now to the due process the Constitution requires. *See Walker v. Sumner*, 14 F.3d 1415, 1420 (in the Ninth Circuit, where a prison provides more generous procedures than those required under the Due Process Clause, but then fails to comply with its own regulations, the test is whether the prison procedures that *actually were* provided rose above the floor set by the Due Process

---

[12] The Court notes that the two cases cited by the plaintiffs, *Ex-Parte Jackson*, 96 U.S. 727, 733 (1877) and *U.S. v. Van Leeuwen*, 397 U.S. 249 (1970), refer to the Fourth Amendment right to privacy in mail enjoyed by the general population, not by convicted prisoners.

Clause), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472, 485 (1995). *Martinez* set out the basic principle that inmates are owed certain due process protections under the Constitution when their mail is censored. *Martinez*, 416 U.S. at 418-19. This principle still stands. *Krug v. Lutz*, 329 F.3d 692, 697 (9th Cir. 2003) ("although *Thornburgh* overruled *Martinez's* substantive component, it did not disturb *Martinez's* procedural due process aspects."). Thus, an inmate must receive the "minimum procedural safeguards" established in *Martinez* when a prison censors an inmate's mail; these procedures include notice, appeal and the right to review of the prison official's decision. *Martinez*, 416 U.S. at 418-19; *see also Krug*, 329 F.3d at 697-98 (noting the liberty interest as set out in *Martinez*); *see also Prison Legal News v. Lehman*, 397 F.3d 692 (9th Cir. 2005) (setting out minimum procedural safeguards in *Martinez*).

Based upon Fourteenth Amendment jurisprudence, the issue then is what procedures were afforded to the plaintiffs, and if no safeguards were afforded, whether the prison's criminal investigation was a justifiable reason for failure to provide those safeguards.

### b. Procedures provided to the plaintiffs

Plaintiffs allege that beginning on December 23, 1999 and continuing thereafter, defendant Fournier censored the plaintiffs' mail by opening and reading portions of both incoming and outgoing mail, photocopying letters of interest, replacing the letters, and then causing them to be delivered (#175, ¶6). The plaintiffs further allege that defendants provided no notice to the plaintiffs of any of these activities, thereby denying plaintiffs their rights to notice and appeal of each instance of censorship (#175, ¶¶ 7-8). Defendants do not respond to these allegations in their reply (#187). In their motions and pleadings, defendants either skirt the issue of whether and when notice and an opportunity to appeal was ever provided to the plaintiffs or simply deny the allegations. *See* #167 (mentioning three instances of when Witherow did receive notice but not

specifically admitting the plaintiffs did not receive notice for other instances); #187 (not responding to plaintiffs' notice allegations); and #155 (responding to the plaintiffs' third amended complaint by denying that defendants failed to provide plaintiffs with any notice and or opportunity to appeal).

Regarding Counts 1 and 3, Witherow admits he had timely notice of the censorship as well as an opportunity to appeal. *See* #175, Ex. 2, p.36 (stating that he appealed the censorship decision for Count 1 to the highest level possible); *see also* #175, Ex.2, p.46 (stating he received an "unauthorized mail notice" for the mail in Count 3) and #175, Ex. 2. pp. 47-48 (stating he did not grieve or appeal this decision because he did not think he would win, not because the prison failed to afford him the opportunity).  Further, the Court found above that there is no evidence at all before the Court that the defendants ever censored Witherow's mail from his attorneys as alleged in Counts 135 – 184.  Thus, Witherow received sufficient due process for Counts 1 and 3 and is not owed due process for Counts 135 – 184 because there is no evidence that his mail was ever read.  The defendants summary judgment motion should be granted as to Counts 1, 3 and 135 – 184 for the Fourteenth Amendment claim.

However, the evidence regarding notice and opportunity to appeal is not clear with respect to Counts 2, 4, and 5 – 134.  There is some evidence demonstrating that defendants initially withheld notice from the plaintiffs, although, defendant Fournier's deposition responses create confusion. *See* #175, Ex. 3, p. 17 (admitting notice wasn't provided in December 1999); pp. 46-7 (admitting notice was not sent to the sender of the mail "at that time"); p. 51 (admitting notice was withheld but failing to indicate for which specific instances of censorship); p. 58 (admitting notice was not provided to Sikorski but stating that he was unsure of exactly what notice former plaintiff Keenan received through her parole officer); p. 61 (stating "each incident that anything was held

against him was documented on a Notice of Charges, therefore he knew that mail was confiscated at that time, so in essence he was aware of it.  He just did not receive the official document, but he was aware of it"); p. 91 (stating that Witherow and former plaintiff Keenan were not provided notice "at that time"); #187, Ex. B, p.19 (responding "probably not" when asked if Witherow ever received notice); p. 23 (stating "according to my documentation on this it says this notice will be held pending investigation, that does not state that he will not be notified anywhere in there").

Defendants, as the moving party, have the burden to provide evidence to support the lack of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317 , 323 (1986).  The defendants have not presented clear evidence that there are no genuine issues of fact to be resolved regarding the notice and opportunity to appeal provided to the plaintiffs.[13]

Moreover, defendants' motion is based almost entirely on the argument that there is no state-created liberty interest in AR 750, therefore, the plaintiffs were owed no due process at all. Defendants failed to acknowledge that under *Martinez*, plaintiffs have a Fourteenth Amendment liberty interest in uncensored mail (subject, of course, to the restrictions of imprisonment), and as such, are owed "minimum procedural safeguards" when their mail is censored.  As a result, defendants failed to brief an issue central to this action.  Additionally, if in fact defendants did not afford the required "minimum procedural safeguards" to the plaintiffs, they neglect to explain how this failure is excused under applicable law.  Defendants urge that the prison's decision to override the plaintiffs' constitutional rights is in itself an "unwritten" regulation governed by the more lenient *Turner* standard.  Defendants, citing only *Shaw v. Murphy*, 532 U.S. 223 (2001), state that *Turner* is the "unitary" standard in "all" constitutional challenges (#167).  However, *Shaw* does

---

[13] Although this evidence may be scattered throughout the record in this five-year case, the court is not obligated to hunt through this lengthy record to prove defendants' case for them.  *See Orr v. Bank of America*, 285 F.3d 764, 775 (9th Cir. 2002), *citing Huey v. UPS, Inc.*, 165 F.3d 1084, 1085 (7th Cir. 1999) ("[J]udges need not paw over the files without assistance from the parties.").

not stand for the proposition that the *Turner* analysis replaces the procedural due process analysis established in *Martinez*, *see Krug v. Lutz*, 329 F.3d 692, 697 (9th Cir. 2003) ("although *Thornburgh* overruled *Martinez's* substantive component, it did not disturb *Martinez's* procedural due process aspects."), and defendants cite no other caselaw to support this argument. The position that defendants assert would permit a prison warden, in his or her discretion, to entirely override an inmate's constitutional due process rights if he or she deems it appropriate. While prisons have much discretion, there are limits to it, and Supreme Court jurisprudence is meant to prevent such arbitrary action.

In the absence of arguments under applicable law and supporting evidence that shows there is no genuine issue of material fact, this court denies defendants' motion for summary judgment as to Counts 2, 4 and 5 – 134 with respect to the plaintiffs' Fourteenth Amendment claims.

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the Court finds that the plaintiffs' First Amendment claims fail because defendants were permitted to censor the plaintiffs' incoming mail for legitimate penological reasons; defendants were also permitted to censor outgoing mail based on alleged criminal activity. Additionally, aside from the package Witherow received from his attorney on February 10, 2000, which the Court found was censored for a valid penological reason, the Court finds that Witherow has presented no evidence that the defendants censored his legal mail. Further, the Court finds that the defendants were permitted to prohibit communication between felons. The Court additionally finds that the plaintiffs' Fourth Amendment claim fails because plaintiffs had no reasonable expectation of privacy in their mail in light of legitimate security issues. Finally, the Court finds that as to some of the plaintiffs' Fourteenth Amendment claims, notice and a an opportunity to appeal were provided; as to the other claims, genuine issues

of material fact exist and defendants failed to clearly state the applicable law.

As such, the court respectfully recommends that the defendants' motion for summary judgment (#167) be granted in part and denied in part.

The parties are advised:

1.    Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that:

Defendants' motion for summary judgement (#167) be **GRANTED** as to all First Amendment claims.

Defendants' motion for summary judgement (#167) be **GRANTED** as to Fourth Amendment claims.

Defendants' motion for summary judgement (#167) be **GRANTED** as to plaintiffs' Fourteenth Amendment claims for Counts 1, 3 and 135 – 184 and be **DENIED** as to the plaintiffs' Fourteenth Amendment claim for Counts 2, 4, and 5 – 134.

**DATED:** November 7, 2006.

_____

**UNITED STATES MAGISTRATE JUDGE**